1

2 **UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

3

4 Corry Alexis Hawkins,                              Case No. 2:20-cv-01852-CDS-MDC

5                          Petitioner         **Order Denying Second Amended Petition**
**for Writ of Habeas Corpus under 28 U.S.C.**
6 v.                                                              **§ 2254**

7 Jeremy Bean, et al.,
[ECF No. 22]
8                          Respondents[1]

9

10          Petitioner Corry Hawkins is a Nevada prisoner serving life without the possibility of

11 parole after pleading guilty to murder with use of a deadly weapon, conspiracy to commit murder,

12 burglary while in possession of a deadly weapon, and possession of a firearm by a prohibited

13 person. Pending before the court is his second amended petition for writ of habeas corpus under

14 28 U.S.C. § 2254. Second am. pet., ECF No. 22. In that petition, Hawkins sets forth six grounds

15 for relief: (1) his counsel was ineffective at sentencing; (2) his plea was not knowing, voluntary, or

16 intelligent; (3) his counsel was ineffective in investigating the State's witness, Jessica Austin; (4)

17 his counsel was ineffective in telling him to plead guilty; (5) his counsel ineffectively coerced him

18 to plead guilty; and (6) his counsel was ineffective on appeal. *Id.* Based on these grounds, Hawkins

19 alleges that his Fifth, Sixth, and Fourteenth Amendment rights were violated. *Id.*

20          For the reasons discussed below, I deny Hawkins's petition. But I find that reasonable

21 jurists could debate the prejudice that Hawkins suffered from trial counsel's deficient performance

22 at sentencing, so I grant a certificate of appealability on ground 1.

23

24

25

26 _____

[1] The Nevada Department of Corrections inmate database states that Hawkins is incarcerated at High
Desert State Prison. Jeremy Bean is the current warden for that facility. At the end of this order, I direct the
Clerk of Court to substitute Jeremy Bean for respondent Calvin Johnson. *See* Fed. R. Civ. P. 25(d).

I.       **Background**

    A.  **Factual background**[2]

    On December 1, 2010, around 11:30 p.m., Nathan Paet was shot in his Las Vegas garage as he was preparing to leave for work at the Nellis Air Force Base. ECF No. 34-3 at 24–27. Nathan staggered back into his home and bled out in front of his wife and four children who had been asleep in the family's living room. *Id.* at 27. The attack was not random. Nathan's wife Michelle was having an affair with her coworker, Michael Rodriguez, and the two conspired to kill Nathan for the life-insurance and military benefits that were payable upon his death. *Id.* at 29–30. Rodriguez involved in the plot his former prison cellmate Hawkins, Hawkins's girlfriend Jessica Austin, and Austin's coworker and friend of a just a few months, Shannon Salliotte. *Id.* at 33–34.

    Salliotte testified before a grand jury that she first met Rodriguez at Austin and Hawkins's apartment the day before Nathan was murdered. *Id.* at 10. Salliotte was coming down from using speed, and she purchased Lortabs and Xanax from Rodriguez to help her sleep that night. *Id.* at 10. Salliotte spent the night at Austin and Hawkins's apartment, and the three of them purchased meth the next day, which Salliotte used. *Id.*  at 11.

    On the day of Nathan's murder, Austin asked if Salliotte would be an alibi for Rodriguez that night while he and Hawkins were doing a drug deal. *Id.* at 11. Austin said that Salliotte would be paid for her assistance; Salliotte agreed. *Id.*  Austin purchased a fire log, and the women returned to Austin's apartment where Hawkins and Rodriguez were playing video games. *Id.* at 11–12.

    Later, Rodriguez got a call or text and then he and Hawkins talked about whether they should bring some of the disposable blue latex gloves that were on the counter. *Id.* at 12–13. Rodriguez and Hawkins quickly left the apartment after Rodriguez received a test message. *Id.* After about an hour, Austin received a call from Hawkins and lit fireplace logs. *Id.* at 13. Next, Rodriguez

---

[2] This summary is merely a backdrop to my consideration of the issues presented in the petition and should not be construed as credibility or factual findings.

and Hawkins rushed into the apartment like they were being chased, stripped off all their clothes, and threw their clothing into the fireplace. *Id.*

Salliotte quickly left with Rodriguez in his black Cadillac while Hawkins and Austin were still burning the clothing. *Id.* at 13–14. Rodriguez told Salliotte they were going to Sunset Station so that they would be seen on the casino's cameras. *Id.* at 14. Rodriguez instructed Salliotte to say that she had been with him all night if police asked. *Id.* Rodriguez rented a room at the casino and withdrew money from the ATM. *Id.* Rodriguez showered and then he and Salliotte had sex, which Rodriguez recorded on his cellphone. *Id.* Rodriguez left the hotel room in the middle of the night, stating that he had to get ready for work. *Id.* Stranded, Salliotte called Austin and Hawkins and they arrived within ten minutes. *Id.* at 14–15.

A detective called Salliotte on December 3rd asking if she knew Rodriguez, stating that he was checking Rodriguez's alibi because he's a suspect in the murder of a Nellis airman. *Id.* at 15. Salliotte responded, as Rodriguez had instructed, that she was his girlfriend, and they had been together at Sunset Station all night. *Id.* After the call, Salliotte told Austin that she was going to tell the police the truth because she was scared and angered that Austin had involved her in a murder. *Id.* Austin insisted that the detective was lying—no one had been murdered. *Id.*

On December 4th, Salliotte met Hawkins and Rodriguez at someone's apartment, and they told her a drug deal involving counterfeit money had gone bad. *Id.* at 16–17. Nathan shot at Hawkins and Rodriguez, Hawkins said he ran to the car once he saw that Nathan had a gun and Rodriguez admitted that he shot Nathan. *Id.* at 17. Salliotte handed Hawkins her cell phone, which he destroyed, and Rodriguez gave her money to buy a new one. *Id.* at 18. Then Rodriguez told Salliotte the story that he needed her to tell police:

> He wanted me to say that Jessica and I went to Wal-Mart. Jessica drove because I was too screwed up and Jessica went into Wal-Mart, I actually stayed in the car to look for my cigarettes. They drilled this into my brain, that's why I can just spill it out like this. And then Michael was walking out of Wal-Mart. He told me to say that I honked my horn, he came over to me in my car and he said that, you know, we were - - started flirting and talking and then I got into his Cadillac with him and Jessica had the keys to my car so there was really nothing to worry about. And he told me to say that we went to this business complex on Sunset and Eastern to watch the planes take off and we were partying there I was smoking, to say I was

smoking weed and he was drinking. And we decided to get a room at the Sunset and he told me that he wanted me to say that we had been together since around 8:30.

*Id.* at 17.

Hawkins and Austin spent the night drilling the alibi story into Salliotte's head. *Id.* at 18. A detective met Salliotte at her work on December 5th, and she told him the alibi story she'd rehearsed with Hawkins and Austin. *Id.* at 19. The next day, the detective called Salliotte and said that he knew she was lying, so she went to the station and told police the "whole truth" and didn't leave anything out. *Id.* at 19.

On December 8th, Austin gave police a voluntary statement. ECF No. 14-7. Austin confirmed that Hawkins was her boyfriend, and that she knew Rodriguez through him. *Id.* at 10. Austin initially stated that she spent part of December 1st at her house with Salliotte, Hawkins, and her neighbors, but not Rodriguez. *Id.* at 26. Before then, she purchased a car cover, blue latex gloves, and air freshener from Wal-Mart. *Id.* at 30–32. Salliotte was with her, but they ran into Rodriguez before entering Wal-Mart, and Salliotte left in his car while Austin drove Salliotte's car to Austin's apartment after she was done shopping. *Id.* at 38–41. Austin and Hawkins went to the Gold Coast to gamble. *Id.* at 46. Then Salliotte called and Austin and Hawkins picked her up from Sunset Station. *Id.* at 47–48.

Austin's story changed after officers said that Michelle knew about Austin and could describe her. *See id.* at 60–61. According to Austin's second version of events, Rodriguez asked to use her apartment after a dope deal in case it went bad. *Id.* at 64–65. Rodriguez said he would pay, and she agreed. *Id.* at 65. Rodriguez came to her and Hawkins's apartment on December 1st, but Salliotte was not there. *Id.* at 61–62.

Austin again altered her story during questioning, stating that, on December 1st, she happened to have a fire burning from a log that she had purchased that day when Rodriguez entered the apartment, removed and burned all his clothing in the fire, and left with Salliotte. *Id.* at 65–66. Austin said that she was scared and confused. *Id.* at 66–67. She took a Percocet and

hydrocodone, drank more, then suggested that she and Hawkins do something because they had Salliotte's car. *Id.* at 69. They went gambling at the Gold Coast and collected Salliotte from Sunset Station after she called. *Id.* at 69–70. Austin insisted that Hawkins was with her on December 1st. *Id.* at 72.

Austin made a verbal proffer to the State on August 11, 2011. ECF No. 46-1 at 27–44. According to the State's investigators' notes, Austin stated that she and Hawkins were at their apartment on December 1st with Rodriguez and Salliotte. *Id.* at 27. Hawkins told Austin that he was going to do a drug deal with Rodriguez. *Id.* Hawkins took out the gun he had bought from Rodriguez months earlier. *Id.* at 29. After whispering together, Hawkins gave Rodriguez the gun and the two abruptly left the apartment. *Id.*

About an hour later, Hawkins called and asked Austin to light a fire. *Id.* at 29. Soon after, Hawkins and Rodriguez burst through the door, stripped, and burned their clothing in the fire. *Id.* at 30. Hawkins put the gun on the counter and the guys told Austin that the gun needed to be cleaned. *Id.* at 30, 34. Austin wiped the gun with disinfectant and put it in a trash bag, which she or Hawkins later threw into a different apartment complex's dumpster. *Id.* at 30, 43. Hawkins begged Austin not to tell police anything, saying they would pin the murder on him because he's Black and has a criminal record. *Id.* at 44.

After they were arrested, Hawkins told Austin that a "prominent figure" had been hurt and said he did not do it. *Id.* at 31, 44. Austin was released to house arrest on September 2, 2011. ECF No. 41-13 at 14. She was released from house arrest to intensive supervision on January 17, 2012. ECF No. 37-4.

### B.  Procedural background[3]

The State of Nevada charged Hawkins with conspiracy to commit murder, burglary while in possession of a deadly weapon, murder with use of a deadly weapon, and possession of a

---

[3] Hawkins was represented in his state criminal case by attorneys Karen Connolly and Dan Bunin, who were later substituted by Andrea Luem. ECF No. 22 at 2, 4. Unless otherwise stated, I collectively and

*(fn. cont...)*

firearm by an ex-felon. ECF No. 34-2. On October 15, 2015, Hawkins pled guilty to all charges. ECF No. 43-4. After appointing Hawkins new trial counsel and conducting an evidentiary hearing, the trial court denied Hawkins's motion to withdraw his guilty plea. ECF Nos. 43-7, 43-9, 43-15, 43-22. The trial court sentenced Hawkins to 48-to-120 months for the conspiracy charge; 72-to-180 months for the burglary charge, to run concurrent with the conspiracy charge; life without the possibility of parole for the murder charge, plus a consecutive term of 96-to-240 months for the deadly weapon enhancement, to run concurrent with the conspiracy charge; and 28-to-72 months for the felon-in-possession charge, to run concurrent with the conspiracy charge; and credited him 2,115 days for time served. ECF No. 44-2.

Hawkins appealed, ECF No. 44-4; the Nevada Court of Appeals (NCA) affirmed the convictions, ECF No. 44-18; and remittitur issued on January 24, 2018, ECF No. 44-19. Hawkins filed his pro se state post-conviction habeas petition on April 4, 2018. ECF No. 44-25. Hawkins was appointed postconviction counsel, ECF No. 45-4, and he filed a counseled supplemental petition on March 4, 2019. ECF No. 45-9. After conducting a hearing, ECF No. 48-4, the state court denied postconviction relief on July 23, 2019. ECF No. 48-5. Hawkins appealed, ECF No. 48-9; NCA affirmed, ECF No. 49-6; and remittitur issued on August 10, 2020, ECF No. 49-7.

Hawkins transmitted his original pro se federal habeas petition on September 1, 2020. ECF Nos. 8, 9. The court appointed the Federal Public Defender (FPD) to represent Hawkins. ECF No. 13. FPD filed Hawkins's operative petition, which asserts six grounds for relief:

1.  Trial counsel was ineffective by failing to present mitigating evidence at sentencing.

2.  Hawkins's guilty plea is invalid because:

    A.  Trial counsel was ineffective by failing to investigate codefendant Austin,

    B.  Trial counsel was ineffective by advising him to plead guilty,

    C.  Trial counsel was ineffective by coercing him to plead guilty, and

---

individually refer to them as "trial counsel." Luem also represented Hawkins during his direct appeal of his conviction. *Id.* at 5. I refer to Luem in this capacity as "appellate counsel." Hawkins was represented during his state postconviction writ proceedings by attorney Jamie Resch. *Id.* I refer to Resch as "postconviction counsel."

D.  The State withheld exculpatory evidence.

3.  Trial counsel was ineffective by failing to investigate codefendant Austin.

4.  Trial counsel was ineffective by advising him to plead guilty.

5.  Trial counsel was ineffective by coercing him to plead guilty.

6.  Appellate counsel was ineffective by failing to raise issues that trial counsel was ineffective by:

A.  Failing to investigate codefendant Austin and misunderstanding and withholding notes from her proffer; and

B.  Coercing Hawkins to plead guilty.

ECF No. 22.

The respondents moved to dismiss grounds 1 to 4, arguing they do not relate back to Hawkins's original petition, and that grounds 2 to 4 are procedurally defaulted. ECF No. 33. I denied the dismissal motion as to grounds 2 to 4, finding them exhausted and not procedurally defaulted. ECF No. 70. And I deferred a decision on whether Hawkins can demonstrate cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012), for ground 1 until after the parties have answered and replied. *Id.* The respondents answered and reasserted their procedural default argument as to ground 1. ECF No. 87. Hawkins replied on July 12, 2024. ECF No. 94.

## II.  Legal standard of review

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act (AEDPA):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Under § 2254(d)(1)'s first clause, a state court decision is contrary to clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if the state court decides a case differently than the Supreme Court on "a set of facts that are materially indistinguishable" from the Supreme Court's case. *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (cleaned up) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

Under § 2254(d)(1)'s second clause, a state court decision is an unreasonable application of clearly established Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (cleaned up) (quoting *Williams*, 529 U.S. at 413). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "Instead, § 2254(d)(2) requires that [federal habeas courts] accord the state trial court substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). Thus, "if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Id.* (cleaned up) (quoting *Wood*, 558 U.S. at 301; and *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). "This is a daunting standard—one that will be satisfied in relatively few cases." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *overruled on other grounds by Pinholster*, 563 U.S. at 185. But it is met "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Id.* at 1001 (citing *Wiggins v. Smith*, 539 U.S. 510, 526–30 (2003); and *Hall v. Director of Corr.*, 343 F.3d 976, 983 (9th Cir. 2003)).

III.    Discussion

    A.  Ground 1—mitigation-based Ineffective Assistance of Trial Counsel

In ground 1, Hawkins alleges ineffective assistance of trial counsel (IATC) by failing to investigate and present mitigation evidence that might have spared him from being sentenced to life imprisonment without the possibility of parole. ECF No. 22 at 7. Specifically, he argues that trial counsel Luem had in her possession—but did not present—evidence from three experts that original trial counsel Connolly and Bunin retained: (1) death-penalty-mitigation specialist Bill Clutter, (2) forensic and clinical psychologist and neuropsychologist John Fabian, and (3) sociologist Carl Taylor. *Id.* at 8–12. Hawkins also argues that Luem did not ask his mother, Jeenen Hawkins, or his maternal aunt, Elana Hines, if they would testify at sentencing. *Id.* at 12.

The only part of ground 1 that Hawkins raised to NCA is Luem's failure to present evidence from Dr. Fabian about Hawkins's troubled childhood, dysfunctional family history, and drug-use history. *See* ECF No. 49-1 at 31–36. With the exception of Dr. Fabian's expert report, all evidence supporting ground 1 was presented for the first time in this federal habeas proceeding. Relying on *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014), and *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986), Hawkins argues the additional factual allegations and evidence presented for the first time in federal court "fundamentally alters and significantly strengthens" this claim into a new claim "that was never presented to the state court." ECF No. 66 at 17. Hawkins argues that his new mitigation-based IATC claim is technically exhausted and procedurally defaulted, but he can overcome the default under *Martinez* based on postconviction counsel's ineffectiveness. *Id.* at 18–21. Alternatively, Hawkins argues that ground 1's arguments about Dr. Fabian is exhausted. *Id.* at 21–22.

As outlined above, I deferred deciding whether Hawkins can demonstrate cause and prejudice under *Martinez* to overcome the procedural default of ground 1 until merits review. ECF No. 70 at 5–7. I now conclude that Hawkins's *Martinez* argument is foreclosed by *Shinn v. Ramirez*, 596 U.S. 366 (2022).

### 1. *Hawkins's* Martinez *argument is foreclosed by* Ramirez.

Under *Martinez*, a petitioner can show cause to potentially overcome the procedural default of an IATC claim by demonstrating that either (a) he had no counsel during the state postconviction proceedings or (b) postconviction counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), standards. 566 U.S. at 14. To demonstrate prejudice under *Martinez*, the petitioner must show that the underlying IATC claim is "substantial." *Id.* A claim is substantial if it has "some merit." *Dickinson v. Shinn*, 2 F.4th 851, 858 (9th Cir. 2021) (quoting *Martinez*, 566 U.S. at 14).

Under 28 U.S.C. § 2254(e)(2), if a petitioner "has failed to develop the factual basis of a claim in State court proceedings," then a federal habeas court may hold an evidentiary hearing on the claim in only two narrow circumstances: the claim relies on either (i) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or" (ii) "a factual predicate that could not have been previously discovered through the exercise of due diligence[.]" *See* 28 U.S.C. § 2254. In *Ramirez*, the Supreme Court reiterated that "§ 2254(e)(2) applies only when a prisoner has failed to develop the factual basis of a claim." 596 U.S. at 382. It reiterated that "state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner." *Id.* And it held that when 28 U.S.C. § 2254(e)(2) applies and the petitioner "cannot satisfy its stringent requirements, a federal court may not hold an evidentiary hearing—or otherwise consider new evidence—to assess cause and prejudice under *Martinez*." *Id.* at 389 (cleaned up).

In *Ramirez*'s wake, the Ninth Circuit abrogated its holding in *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014), "that a petitioner's new evidence could be considered as so fundamentally altering his ineffective assistance claim that the augmented version of the claim should be considered a new claim potentially entitled to de novo review in federal court." *Hampton v. Shinn*, 143 F.4th 1047, 1076 (9th Cir. 2025) (cleaned up) (collecting cases). "As [*Ramirez*] makes clear, under § 2254(e)(2), new evidence not presented in state court cannot be considered on the merits

or to assess cause and prejudice under *Martinez*." *Id.* (cleaned up). This means a "'new' IAC claim under *Dickens* never gets off the ground—both because the new evidence is excluded from merits review and because a prisoner cannot use that evidence under *Martinez* to excuse a procedural default and capitalize on the de novo review that *Dickens* would have allowed." *Id.*

Hawkins does not argue—and I do not find—that ground 1 falls under either of § 2254(e)(2)(A)'s exceptions because this claim does not rely on a new but retroactive rule of constitutional law or a factual predicate that could not have been previously discovered using due diligence. Indeed, the core of Hawkins's argument is that trial counsel Luem failed to present mitigation arguments and evidence at sentencing that had been provided to her by his original trial counsel many months earlier. So the upshot of the sea change caused by *Ramirez* is that I may consider only whether NCA properly rejected Hawkins's original mitigation-based IATC claim based on the record that was presented to that court unless Hawkins demonstrates that AEDPA deference is not merited.

### 2. Background

During the sentencing hearing, trial counsel Luem argued:

> Thank you, Judge. As the Court's aware, I'm sort of late to the game on this case. I took over Mr. Hawkins' case after he filed a motion to withdraw his guilty plea. So to the extent, and, again, I'm not going to recite the facts, but my awareness of the case, Judge, and my understanding is that Mr. Hawkins has always asserted that he was not the shooter, that Ms. Paet and Mr. Rodriguez planned this murder, that Ms. Paet paid Mr. Rodriguez, he was actually the one who shot and killed the victim in this case and that Mr. Hawkins was possibly merely present at the scene.

> The State suggests that Mr. Hawkins is as culpable as the other codefendants. But we still have another codefendant, Ms. Austin, who's yet to be sentenced. And I'm fairly certain that -- that Ms. Austin, who assisted to a similar extent that Mr. Hawkins did with respect to the aftermath of the crime, is likely to get a sentence of probation. So I think there's sort of a range that the Court can consider here in terms of culpability.

> I agree that Ms. Paet is the most culpable one here. This was her idea. She set the wheels in motion. She had a relationship with Mr. Rodriguez, gave him the information, and to the extent that Mr. Hawkins was involved, all we know really is that he was with Mr. Rodriguez after the crime was committed.

The -- the prior record of Mr. Hawkins, and I take issue a little bit with the way that P and P[4] characterizes him as having eight prior felonies. He actually has four prior felonies. Again, it's a substantial number of felony convictions, but they are possession of stolen vehicle, robbery. Nothing to suggest, despite what the State says, that Mr. Hawkins has a violent tendency.

He doesn't have any prior crimes that involve harming another individual. And I think that it's safe to say that Mr. Hawkins was just merely present when Mr. Rodriguez committed this crime.

Judge, Mr. Hawkins' mother and aunt wanted to be present today. They were unable to be here, but did want me to express to the Court that they have the utmost support for their -- for their son and nephew, that they will continue to support him in the future. I know the recommendation here is that he receive a sentence of life without the possibility of parole.

* * *

But I ask the Court, implore the Court, to consider a sentence of life with the possibility of parole.

Mr. Hawkins is not a -- is not a – he's a young man, but he's not, you know, an 18-year-old kid. He's – he's -- 28 years in prison is going to be the bulk of the remainder of his life. The difference between perhaps a life without sentence and a life with sentence may only be where Mr. Hawkins is housed for the rest of his life. But I don't believe that he is in the same position as Ms. Paet or Mr. Rodriguez. and I would ask the Court to consider that.

ECF No. 44-1 at 4–6.

Following a statement by the only speaker—Nathan's brother, Eric Paet—the court sentenced Hawkins to life without the possibility of parole, explaining:

Well, you know, [the prosecutor] is right in referencing that I'm probably more familiar with this case than -- than a lot of others that I have. And I'll be honest with you, Mr. Hawkins, every time it comes back on, it's kind of like ripping the Band-Aid off an[d] starting over because, quite honestly, I think it was, I think insidious was the word I used last time when I was addressing Ms. Paet at the time of sentencing, and that's really what it is.

I mean, it was one of the most insidious plots to kill somebody that I had come across during my time as either an attorney or a judge. The length of time that was gone into this, and I'm not saying that you were involved in all of that, but the length of time that went into plotting and planning this, the review of life insurance policies, the -- the various attempts prior to this night and thoughts of ways to do it, and then ultimately, going out and gunning this man down in his garage where his family and children were so that he stumbles in the door and dies in front of his children, was just mind blowing, to be quite honest.

---

[4] I construe "P and P" to mean Parole and Probation ("P&P").

I don't view it, however, as something that you just kind of were the -- the last guy involved the night of or the day of kind of thing. I think it preceded that substantially. And when you consider evidence suggesting that you're a shooter, evidence suggesting you were involved in this for more than just a couple of days type thing, and looking at a very, very extensive and violent prior record and multiple failed paroles and probations and the fact that you had been on parole or been released on parole probably nine months before this offense was committed, yeah, I do agree without any question that life without the possibility of parole is an appropriate sentence.

ECF No. 44-1 at 10–11.

Hawkins filed a pro se petition for writ of habeas corpus arguing that trial counsel Luem was deficient for failing to present any mitigation during sentencing. ECF No. 44-25 at 56. Specifically, Hawkins argued that Luem failed to contact his family, friends, employers, coworkers, and Clutter to testify about his "life and characteristics" at sentencing. *Id.* at 57. Hawkins argued that omitting this evidence meant Luem made "no viable attempt to soften" the State's comments and thus left him appearing like a "true monster." *Id.* at 58.

Resch was appointed to represent Hawkins in the state postconviction proceedings, ECF No. 45-4, and filed a supplemental petition incorporating all grounds raised in Hawkins's pro se petition. ECF Nos. 45-9, 46-1, 47-1. Resch also argued that Luem did not file a sentencing memorandum or argue why life with the possibility of parole was an appropriate sentence for Hawkins. ECF No. 45-9 at 28. Resch additionally argued that "[w]hile there is a wealth of mitigation evidence available in trial counsel's records, much of it is largely summarized by one helpful document—Dr. Fabian's report, which was based on four days of evaluations with Hawkins, [and] is one of the more complete mitigation reports prepared in any death penalty case in Clark County, Nevada." *Id.* at 28–29.

Resch provided the entirety of Dr. Fabian's 28-page report to the state postconviction court. ECF No. 47-1 at 192–219. He quoted Dr. Fabian's summary of available mitigation evidence. ECF No. 45-9 at 29. He highlighted several mitigating factors available from that evidence, including Hawkins's childhood factors. For instance, the lack of a father and family history of profound mental illness, his substance abuse disorder, and his history of being "dragged into

1   criminal activity by others." *Id.* at 29–31. And Resch sought and obtained the appointment of

2   experts to investigate Hawkins's postconviction arguments. ECF Nos. 45-5, 45-8.

3       The state postconviction court heard oral argument on the petition. ECF No. 48-4. The

4   court denied Hawkins's petition in a written order, explaining that the overall thrust of

5   Hawkins's mitigation-based IATC claims were "belied by the record" because trial counsel

6   presented several mitigation arguments at sentencing:

> Counsel, for example, argued that Petitioner was "possibly merely present at the scene" and had not participated in either the shooting or the plan which preceded it. Supp. 314. Counsel also argued that the victim's wife was "the most culpable one" in this case, and that the most that Petitioner definitively did was be with Rodriguez at some point after the crime was committed. *Id.* Further, counsel argued that Parole and Probation erroneously determined that Petition [sic] had eight prior felonies Petitioner had committed were not violent. *Id.* Counsel continued that Petitioner "doesn't have any prior crimes that involve [physically] harming another individual." *Id.*

> Petitioner alleges that his counsel argued that a sentence of life without the possibility of parole would have been the same as a sentence of life with the possibility, but this inaccurately depicts counsel's argument as it fails to consider the context in which the statement was made. Supp. Pet. at 30. Counsel was not arguing that the two sentences were the same—they are not. Instead, counsel was arguing that because Petitioner was older, a sentence allowing for the possibility of parole would allow the court to show Petitioner mercy without putting the public at risk: 28 years in prison is going to be the bulk of the remainder of his life. The difference between perhaps a life without sentence and a life with sentence may only be where Mr. Hawkins is housed for the rest of his life. Supp. at 314.

> > [FN 2] Petitioner argues that reasonably effective counsel would have argued this but fails to mention that this exact argument was made. Supp. Pet. at 29.

> And even assuming *arguendo* that counsel had argued that the two sentences are the same, it is risible to argue that this Court would have uncritically accepted that patently incorrect assertion. Even the layman understands that there is a difference between the word *with* and the word *without*.

> Petitioner cannot show that his trial counsel was deficient at sentencing. His entire argument is based on a misrepresentation of the record. While counsel did, concededly, fail to file the mitigation report or present every detail from it, counsel nevertheless argued against holding Petitioner to the same degree of guilt as his co-conspirators and even attempted to argue that Petitioner was "merely present." The decision to make this argument instead of others is strategic and virtually unchallengeable. *Dawson*, 108 Nev. At 117, 825 P.2d at 596; *see also Ford*, 105 Nev. At 853, 784 P.2d at 953. A consideration of counsel's effectiveness at sentencing should, moreover, not be confined to the hearing itself-prior to it, counsel had effectively negotiated with the State to preclude it from seeking the death penalty

and to have each count run concurrent with all other counts. The steps counsel took in negotiations further buttress its effectiveness at sentencing.

Furthermore, Petitioner cannot demonstrate that he was prejudiced by his counsel's representation at sentencing. The district court explained the reasoning behind the sentence it was imposing on Petitioner at length ....

* * *

Petitioner has not carried the burden of demonstrating that his sentence would have been different had more mitigation evidence been presented to the district court. The district court was aware of the facts in this case. It knew how long the murder was planned, and it knew that Petitioner was deeply and substantially involved in the murder conspiracy and the ultimate murder. There is no reasonable probability of parole based on these facts. Petitioner's argument is based on the naked assertion that if his trial counsel had only presented the information in its lengthy mitigation report, it would have made a difference. This Court's statements bely that assertion, and, this Court, therefore, declines to find Petitioner's trial counsel ineffective at sentencing.

ECF No. 48-5 at 29–31.

In appealing the denial, Hawkins faulted Luem for failing to prepare for or present mitigating evidence at sentencing, repeating the argument that Dr. Fabian's report "largely covers the available mitigation evidence[,]" including Hawkins's difficult childhood, dysfunctional family history, and drug-use history. ECF No. 49-1 at 31–36. And he provided Dr. Fabian's report to NCA to support the appeal arguments. *See* ECF No. 48-11 at 3.

### 3. *Legal standard*—Strickland

In *Strickland*, the Supreme Court set forth a two-prong test for analyzing ineffective-assistance-of-counsel claims that requires the petitioner to demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness" "under prevailing professional norms" and (2) the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 688, 694. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696. In *Lafler v. Cooper*, the Supreme Court held it was clearly established

that *Strickland* applies to noncapital sentencing proceedings. 566 U.S. 156, 165 (2012); *accord Daire v. Lattimore*, 812 F.3d 766, 767–68 (9th Cir. 2016) (en banc) (holding that *Strickland* applies to noncapital sentencing proceedings and overruling all contrary circuit decisions).

A federal habeas court's "scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* Under the prejudice prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### 4. *State court determination*

NCA affirmed the decision denying Hawkins's postconviction writ petition, concluding that he failed to satisfy either *Strickland* prong as to his mitigation-based IATC claims. ECF No. 49-6 at 2–3, 4–5. Specifically, NCA held:

> Third, Hawkins claimed that his counsel was ineffective for failing to adequately present mitigation evidence at the sentencing hearing. Hawkins asserted his counsel should have presented evidence concerning his difficult childhood, mental health issues, substance abuse, and juvenile record. Hawkins also contends that counsel should have argued that he was not the person that shot the victim. The district court reviewed the sentencing hearing and found Hawkins' claims lacked merit because counsel raised these issues during that hearing. Substantial evidence supports the district court's findings. Hawkins failed to demonstrate his counsel's performance fell below an objectively reasonable standard or a reasonable probability of a different outcome had counsel presented additional similar information at the sentencing hearing. Therefore, we conclude the district court did not err by denying this claim.

ECF No. 49-6 at 4–5.

### 5. *Analysis*

As stated above, NCA held that the state postconviction court did not err when it denied Hawkins's mitigation-based IATC claim. In so holding, NCA determined that substantial evidence supports the state court's findings that trial counsel raised Hawkins-isn't-the-shooter arguments and evidence about his childhood, mental-health, drug-use, and juvenile-record

histories during the sentencing hearing. Hawkins argues this determination is unreasonable under § 2254(d)(2) because trial counsel did not address his histories during sentencing. ECF No. 94 at 14–15. I disagree.

NCA plainly misstated the state record when it lumped all the mitigation issues together and found the state court had determined that trial counsel raised them during sentencing. The sentencing transcript demonstrates that trial counsel raised Hawkins-isn't-the-shooter arguments and touched on Hawkins's juvenile record during sentencing, argued that he only had four prior felonies, and none involved harming another person. But counsel did not raise issues about Hawkins's troubled childhood, family history, mental health, or drug use during sentencing. What's more, the postconviction court did not find that the entirety of Hawkins's mitigation-based IATC claim was belied by the record because trial counsel had raised each issue during sentencing. Rather, it found arguments that trial counsel failed to contend that Hawkins was not the shooter and never made incriminating statements were belied by the record. Specifically, the sentencing transcript and Hawkins's plea canvas. ECF No. 48-5 at 28–29. And as for Hawkins's histories, the court found that while trial counsel "fail[ed] to file the mitigation report or present every detail from it[,]" counsel "nonetheless argued against holding [Hawkins] to the same degree of guilt as his co-conspirators and even attempted to argue that [Hawkins] was 'merely present.'" ECF No. 48-5 at 30.

That NCA misstated the record does not end this inquiry, however, because the question under § 2254(d)(2) is "not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable—'a substantially higher threshold' for a prisoner to meet." *Shoop v. Twyford*, 596 U.S. 811, 819 (2022) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); and citing *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011)). As the Ninth Circuit explained in *Taylor*, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central

1  to petitioner's claim, that misapprehension can fatally undermine the fact-finding process,

2  rendering the resulting factual finding unreasonable." 366 F.3d at 1001.

3      Reviewing the entire state record pertaining to this claim, I find that NCA's challenged

4  language is a technical misstatement that is not material and does not render its ultimate

5  determination objectively unreasonable. I reach this conclusion for two reasons. First, as

6  explained above, the challenged statement about what issues were belied by the record is correct

7  as to some of the points that Hawkins and postconviction counsel raised. This includes the points

8  identified above and arguments that trial counsel's entire mitigation case was that Hawkins was

9  young, trial counsel argued there is no functional difference between a sentence with or without

10  the possibility of parole, and trial counsel failed to argue that Austin's proffer notes do not say he

11  is the shooter.[5]

12      Second, in concluding that Hawkins failed to show deficient performance or "a

13  reasonable probability of a different outcome had counsel presented additional similar

14  information at the sentencing hearing," ECF No. 49-6 at 4–5, NCA was writing from the factually

15  correct viewpoint that postconviction counsel provided Dr. Fabian's report in the state writ

16  proceedings. Moreover, the state postconviction court—the same judge who sentenced Hawkins

17  and presided over all the defendants' criminal cases—unequivocally stated that it did not "believe

18  that any social history information that was dug up in mitigation for possible presentation to a

19  capital jury was changing [its] mind on the propriety of a life without sentence." ECF No. 48-4 at

20  13.

21      Because NCA's technical misstatement is not an unreasonable determination of the facts

22  under § 2254(d)(2), I defer to that court's factual findings. Applying that standard, I find that

23  NCA reasonably rejected Hawkins's mitigation-based IATC claim. And I would reach the same

24  result on *Strickland*'s prejudice prong on de novo review for the following reasons.

25

26  ─────────────────
[5] As explained *infra*, despite various attorneys' confusion, the record shows that Austin's Hawkins-was-the-shooter anticipated trial testimony was verbally conveyed by her attorney to Hawkins's original trial counsel; that statement was not in the notes from her verbal proffer.

I assume without deciding that trial counsel performed deficiently by failing to present any mitigation evidence at sentencing. As for the prejudice prong of the analysis, Hawkins faults trial counsel for failing to present evidence from three expert sources: (1) Dr. Fabian; (2) Dr. Taylor; and (3) Clutter. ECF No. 22 at 8–13.[6] Hawkins offers several pieces of new evidence about Clutter including that expert's declaration dated May 11, 2021, ECF No. 14-26, and many memoranda he prepared during the state criminal case summarizing his interview of potential mitigation witnesses. ECF Nos. 14-3, 14-11, 14-12, 14-13, 14-14, 14-15, 14-16, 14-17, 14-18, 14-19, 14-20, 14-21, 14-22, 14-23, 14-25. According to Clutter's memoranda, several witnesses were willing to testify at sentencing, many recalled Hawkins's impoverished and troubled childhood, dysfunctional family history, and history of substance abuse. And many of the witnesses had kind things to say about Hawkins, including that he was not violent. Clutter states in his declaration that he "was never contacted by Andrea Luem or by any other attorney/investigator working on Corry's behalf in post-conviction proceedings" until FPD investigator Smith contacted him. ECF No. 14-26 at 3. Clutter states that if he had been contacted, he "gladly would have provided a copy of [his] file or continued to work on Corry's case." ECF No. 14-26 at 3.

Hawkins offers Dr. Fabian's report, which he provided to the state courts during the writ proceedings. And he offers new evidence in the form of Dr. Fabian's May 12, 2021, declaration. Dr. Fabian declares that he was not contacted to testify at sentencing. ECF No. 14-27 at 3. Dr. Fabian states that if he had been asked, he "would have explained the mitigating circumstances [he] found in Mr. Hawkins' case, which [he] summarized in the report provided to Ms. Connolly." *Id.*

---

[6] Hawkins also faults trial counsel for failing to present testimony from his friends and family, but he has not demonstrated that any of them were able and willing to testify on his behalf. Trial counsel stated during sentencing that Hawkins's "mother and aunt wanted to be present today. They were unable to be here, but did want me to express to the Court that they have the utmost support . . . for their son and nephew, and that they will continue to support him in the future." ECF No. 44-1 at 6. Hawkins disputes this and offers recent declarations from his aunt Elana and FPD investigator Tammy Smith, who interviewed his mother Jeenen, to support his argument. ECF Nos. 23-1 at 2, 23-2 at 2. But I cannot consider this new evidence, *see Cullen*, 563 U.S. at 181, and I would reach the same conclusion even if I could because Elana and Jeenen do "not recall" if they were asked to testify at sentencing. ECF Nos. 23-1 at 2, 23-2 at 2.

Further, Dr. Fabian "could have explained how Mr. Hawkins' neurocognitive deficits may have affected his functioning in the legal process or its relevance to his culpability." *Id.*

There is no declaration from Dr. Taylor, but Hawkins provides new evidence in the form of an hour-long taped interview in which Dr. Taylor explains his study of the blighted community in Detroit where Hawkins grew up. ECF No. 16. I note the state court received a copy of Dr. Taylor's Curriculum Vitae when trial counsel Connolly and Bunin unsuccessfully moved to continue trial because Dr. Taylor was having health issues. ECF No. 37-7. In that motion, trial counsel explained that "Hawkins grew up in a drug blighted area of Detroit, Michigan. Dr. Taylor is a social science expert on inner city Detroit. He has conducted extensive research on the Detroit Street gang Young Boys' Inc., which recruited Hawkins when he was 9 years old to sell crack cocaine." *Id.* at 5.

The proffered expert evidence contains what courts have called "classic mitigation evidence." *See Lambright v. Schriro*, 490 F.3d 1103, 1116–21 (9th Cir. 2007). All Hawkins's postconviction attorneys agree that Dr. Fabian's report contains a robust and detailed summary of the mitigation arguments and evidence that was available at sentencing. *See* ECF Nos. 45-9 at 28–30, 49-1 at 32–34 (Resch repeatedly described Dr. Fabian's report as a "helpful" "summary that largely covers the available mitigating evidence" and is itself "a lot to digest"); *see also* ECF No. 22 at 8–10 (appointed FPD counsel describes Dr. Fabian's background analysis as "extensive" and his documentation of mitigation areas as "meticulous"). In this report, Dr. Fabian opines that Hawkins has borderline intellectual functioning and suffered a dysfunctional and neglectful childhood. Hawkins was surrounded by mentally ill and substance-addicted adults who normalized criminal behavior. His biological father was murdered, he had no other father figure, and his mother struggled with mental illness and addiction. Hawkins was recruited by a drug gang as a child in Detroit. Hawkins viewed this as normal and later defended the gang because it fed and protected him. Hawkins abused controlled substances as a child, and Dr. Fabian opined that he was addicted to cannabis and cocaine. *See generally* ECF No. 47-1.

As outlined above, postconviction counsel provided Dr. Fabian's report in arguing that trial counsel was ineffective at sentencing, and the court concluded that the omitted evidence would not have altered its decision to sentence Hawkins to life without the possibility of parole:

> Petitioner has not carried the burden of demonstrating that his sentence would have been different had more mitigation evidence been presented to the district court. The district court was aware of the facts in this case. It knew how long the murder was planned, and it knew that Petitioner was deeply and substantially involved in the murder conspiracy and the ultimate murder. There is no reasonable probability of parole based on these facts. Petitioner's argument is based on the naked assertion that if his trial counsel had only presented the information in its lengthy mitigation report, it would have made a difference. This Court's statements bely that assertion, and, this Court, therefore, declines to find Petitioner's trial counsel ineffective at sentencing.

ECF No. 48-5 at 31. Hawkins's trial, sentencing, and postconviction courts are one in the same, and that court reached this conclusion having presided over the criminal cases of all defendants charged in the murder, not just Hawkins's state proceedings. *See* ECF No. 44-1 at 3. The court provided further insight into its decision-making during oral argument on the writ petition:

> Here's the reality. This case was incredibly egregious in my mind. I gave Michelle Paet life without parole and she had no criminal history because the plotting, planning, and execution of this gentleman in the Air Force in his garage where he stumbled into his house and died in front of his children was astonishing to me. The lack of remorse for humanity to do that to that gentleman who was doing nothing other than to provide for his family and four people plot to kill him and try to get his life insurance policies.
>
> Mr. Hawkins came before the Court having pled guilty with eight prior felony convictions, including robbery with use of a deadly weapon, burglary, grand larceny, stolen vehicles, fraud. You name it. He'd been paroled I believe about seven months prior to the time this offense occurred. Life without parole was a benefit to him because I am confident that had he gone to trial and been convicted, a jury would have sentenced him to death.
>
> So I don't believe that any social history information that was dug up in mitigation for possible presentation to a capital jury was changing the Court's mind on the propriety of a life without sentence. That's separate from my belief that Ms. Luem did an effective job in representing him, but I'm just telling you that that – that wasn't going to make a difference on anything.

ECF No. 48-4 at 13.

Even putting aside the state court's own statements, I do not find there is a reasonable probability of a different sentencing outcome because the omitted evidence supports the State's opening salvo at sentencing: Hawkins's legal histories demonstrate that when he's not in prison, "he is committing extremely violent offenses." ECF No. 44-1 at 4. Parts of Dr. Fabian's report support this argument and provide more detail about his prior crimes and rehabilitation failures than the presentence investigation report:

> Mr. Clutter was able to gather information about Mr. Hawkins's legal history. Around age 12 he was arrested for Burglary by the Las Vegas Metropolitan Police Department. He had a history of breaking into cars. He was placed on probation around that time. He had a history of juvenile probation violations. As noted in this report, Mr. Hawkins's mother was not consistent in bringing Corry for his scheduled appointments and she was not committed to him completing his probation. She made excuses for most of his negative behaviors. He was arrested for Conspiracy and Possession of a Stolen Vehicle at age 14. According to Judge Fischer's order in 1992, he described Mr. Hawkins as an emotionally disturbed child and he should receive treatment at the camp, which was called the Spring Mountain Youth Camp, and was a treatment and work camp. Geneen was ordered to participate in any or all counseling and training as deemed necessary by the director of Spring Mountain Youth Camp.
>
> Most of Mr. Hawkins' criminal history is described as auto thefts and possession of stolen cars in California and Las Vegas. At age 16 he continued to have possession of stolen vehicle cars and other charges such as curfew violations. He had difficulties with holding routine jobs and was violating curfew and giving false information. He continued to violate probation. He was involved with an armed robbery type incident in 1994 with a stolen vehicle. He was arrested for Robbery with the Use of a Deadly Weapon and Possession of a Stolen Vehicle in 1994. At age 17 he pled guilty to Burglary and Possession of a Stolen Vehicle. He was sentenced to four years in the Nevada Department of Corrections and was placed on probation. He and another codefendant then committed grand larceny and stole another car. He had probation violations for testing positive with marijuana, and then he was arrested at age 17 for Burglary from an Auto and Conspiracy to Commit Burglary and Possession of a Stolen Credit Card and Possession of Stolen Property. He was certified as an adult by Judge Gerald Hardcastle and transferred to adult court by age 17/18. He noted that Mr. Hawkins was not attending school, was unemployed, and associating with Donna Street Crip Street Gang. The judge stated it seemed apparent that the time spent in the juvenile system, on probation, at Spring Mountain Youth Camp, and on parole had not made an impact on him due to the fact that the seriousness of his crimes had escalated. His probation was revoked in 1996 at age 18, and he was sent to the Nevada Department of Corrections. When he was released, he and another friend committed a grand larceny by stealing another car. By around 1999, Mr. Hawkins was arrested with his uncle Corry Johnson for Armed Robbery.

ECF No. 47-1 at 203.

Additionally, Dr. Fabian opined that Hawkins's incarceration in an adult facility as an adolescent placed him at "severe risk for consistent criminality into adulthood":

> Furthermore, while Mr. Hawkins has a significant, noteworthy criminal history, again he was exposed to a social learning behavioral pattern early on based on his exposure and witnessing of criminal behaviors being accepted and condoned within his family and within his community. He at an early age connected to other antisocial delinquent peers. His mother was not able to adequately supervise him, and this was due to her employment and irresponsibility. Mr. Hawkins had a consistent delinquent criminal history throughout adolescence and then a criminal history in adulthood. He eventually was committing criminal offenses with his uncle.
>
> Mr. Hawkins finally has evidence of being tried as an adult as an adolescent. The research clearly indicates concerns in this area as to future recidivism in that many youth who are tried as an adult and not afforded consistent and intensive juvenile rehabilitation services, but are rather incarcerated at an early age in adult criminal justice systems and prisons, are more likely to continue their criminal offending careers in young adulthood and throughout their adulthood years into middle age and beyond. In essence, being tried as an adult and being exposed to the adult criminal element at a young age places one at severe risk for consistent criminality in adulthood.

*Id.* at 210–11, 217–19. Dr. Fabian concluded that as Hawkins "developed into young adulthood, he was found to be mature and sophisticated enough to be transferred to adult court, and tried as an adult. Unfortunately, the juvenile justice system's process of juvenile transfer and waiver has consistently shown that this procedure heightens young men's risk to continue offending in adulthood." *Id.* at 219.

The interviews Clutter conducted likewise contain evidence the State could have used to support its argument that life without the possibility of parole is an appropriate sentence because they tend to show that Hawkins is a follower who is easily convinced to commit crimes, but not acts to help himself. For example, Hawkins's older half-brother Sterling recalled a troubled childhood but also stated that Hawkins often resisted being told what to do and rejected Sterling's effort to have him join the Army after he amassed juvenile convictions that were not public record. ECF No. 14-11. Although the mother of Hawkins's son said he was sweet and non-violent, her testimony could reveal that Hawkins impregnated her when she was only 15 or 16 and he was 21 or 22. ECF No. 14-12. Testimony from Hawkins's uncle Corry Johnson could support

the argument that Hawkins wasn't violent and didn't use a gun, but it could also reveal that Hawkins was associating with a street gang, had committed 3–4 robberies with Corry before they were both caught for the armed robbery in 1999, and Hawkins was involved in planning those robberies, not merely forced to go along with his uncle's plans. ECF No. 14-13.

Testimony from one of Hawkins's friends reveals her experience that he is "kind of a people pleaser." ECF No. 14-16. "He's very impulsive to help someone and doesn't think about himself or the ramifications before he commits to helping somebody." *Id.* at 3. And "[h]e winds up becoming friends with people that are not in his best interest." *Id.* This friend chalked up Hawkins's 1999 arrest for armed robbery and other crimes with his uncle as "another example of Corry making bad decisions trying to please others." *Id.* at 4.

A friend of Hawkins's mother from Detroit, who also moved to Las Vegas, could corroborate that Hawkins was used as a child to sell drugs by a Detroit gang and said she wasn't scared of Hawkins when he was released from prison, but told his mother that she "didn't want him to know where [she] live[d]" because of people he'd know from prison. ECF No. 14-17 at 3–4. One of Hawkins's former girlfriends could testify that Hawkins became reacquainted with Rodriguez at the parole office, and she told Hawkins not to associate with Rodriguez, but he didn't listen. ECF No. 14-18 at 3. A different friend could support the argument that Hawkins wasn't violent, but her testimony also could be used to support the argument that he's a "follower" who is easily convinced to commit crimes. ECF No. 14-19 at 2–3.

I acknowledge that the omitted evidence humanizes Hawkins and helps explain his criminality and recidivism. But this evidence is double edged and could be employed to underscore that rehabilitation is unlikely given Hawkins's histories. The sentencing court found that the aggravating factors were overwhelming (i.e., the murder was for money; the court believed that Hawkins was deeply involved in the plan and for much more than a few days, including aborted plans and trial runs of the murder, and there was evidence that Hawkins was the shooter). The court's sentencing rationale included that Hawkins committed these crimes less

than a year after being released on parole. This dovetails with the State's sentencing theme, which is supported by Hawkins's expert evidence, that society is at risk whenever Hawkins is released on parole or probation. Finally, the sentencing court and postconviction court were one in the same; it had the benefit of Dr. Fabian's robust summary of Hawkins's available mitigation evidence, which postconviction and FPD counsel agree is not mere gloss; and it nonetheless determined the omitted evidence would not have changed its sentencing decision.

Even if I could consider the entire record before me, I would disagree there is a reasonable probability that Hawkins would have received a reduced sentence if trial counsel had presented the omitted expert evidence at sentencing. *Cf. Williams*, 529 U.S. at 396–97 (finding prejudice in capital sentencing context where sentencing judge and postconviction judge were one in the same, and that judge found during postconviction proceedings that there was a reasonable probability of a different sentencing outcome with the omitted mitigation evidence). So Hawkins is not entitled to habeas relief for ground 1. *See Strickland*, 466 U.S. at 700 (explaining that "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim"); *Daire v. Lattimore*, 818 F.3d 454, 465–66 (9th Cir. 2016) (reiterating that even a professionally unreasonable error by counsel does not warrant relief if it "had no effect on the judgment" (quoting *Strickland*, 466 U.S. at 691)). But because the prejudice question is close on these facts, I grant Hawkins a certificate of appealability on this ground.

### B.  Ground 2—validity of guilty plea

In ground 2, Hawkins alleges that his guilty plea was not knowingly, intelligently, or voluntarily entered. *See* ECF No. 22. He argues that trial counsel was ineffective for not investigating codefendant Austin and misconstruing and withholding notes from her verbal proffer, withholding discovery and knowledge that he had a strong mitigation case, and coercing him to plead guilty; and the State withheld exculpatory material. ECF No. 22 at 14–25.

### 1. *Background information*

Hawkins's trial was scheduled to begin on October 19, 2015. ECF No. 37-7 at 5. As trial approached, the State offered to remove the death penalty and not to oppose concurrent sentencing if Hawkins pled guilty to all charges. ECF No. 42-29 at 6–7. During a hearing of pretrial motions on October 13, 2015, trial counsel explained that Hawkins had carefully considered the offer but decided to reject it "despite [trial counsels'] recommendations." *Id.* at 7. The State confirmed that its plea offer was now closed. *Id.* at 7–8.

Next, the trial court heard pretrial motions, including Hawkins's motion to preclude codefendant Austin from testifying or, alternatively, for the production of specific *Brady* and *Giglio* material about her and to continue trial. ECF No. 41-13. The State confirmed in its response what it had stated during an earlier hearing that Hawkins and trial counsel attended: Austin had been "released from custody and placed on house arrest after she gave a proffer to the State regarding the events surrounding the murder[,]" but "was not, and has not been, offered a deal or any type of negotiation in exchange for her release or her testimony." *Compare* ECF No. 37-5 at 3, 18, *with* ECF No. 42-27 at 4. During oral argument, trial counsel told the court:

> On Jessica Austin, we have done no investigation. We are ineffective if we have to go to trial on October 21st, we cannot be effective. We cannot provide this man with effective representation due to the fact that [the State] didn't turn over evidence that this court specifically told them to turn over. Our entire strategy is gone because she goes – I mean, she goes from being somebody who says my client was not involved to somebody who most recently has apparently said that he is now the shooter.

ECF No. 42-29 at 11 (cleaned up). The court denied Hawkins's motion, ECF No. 42-29 at 31, and he pled guilty to all charges two days later. ECF No. 43-4.

One day after pleading guilty, Hawkins dispatched his pro se motion to discharge trial counsel and withdraw his guilty plea. ECF Nos. 43-6, 43-7. Hawkins argued that his plea was invalid because he was led to believe that Austin would testify in his trial, but her name was not on the State's witness list that was filed on October 13, 2015. ECF No. 43-7 at 3. So "[w]ith the new information that the potential witness would not be testifying we believe Mr. Hawkins plea

1  agreement was ill advised. For this reason, Mr. Hawkins believes its [sic] in his best interest to
2  withdraw his plea." *Id.*

3      The court appointed Luem as Hawkins's new trial counsel, ECF No. 43-9, and she filed a
4  counseled motion to withdraw Hawkins's guilty plea, arguing that former trial counsel failed to
5  adequately investigate Austin, failed to share discovery and police reports with Hawkins, and
6  coerced him into pleading guilty. ECF No. 43-15. The trial court held an evidentiary hearing on
7  Hawkins's motion in which Hawkins, his former trial attorneys, and his investigator testified.
8  ECF No. 43-22. The court denied Hawkins's motion, stating its many reasons for doing so on the
9  record. *Id.* at 113–21.

10      2. *Legal standards*—Hill *and* Strickland

11      "The longstanding test for determining the validity of a guilty plea is 'whether the plea
12  represents a voluntary and intelligent choice among the alternative courses of action open to the
13  defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31
14  (1970); citing *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); and *Machibroda v. United States*, 368 U.S.
15  487, 493 (1962)). The voluntariness of a plea "can be determined only by considering all of the
16  relevant circumstances surrounding it." *Brady v. United States*, 397 U.S. 742, 749 (1970) (cleaned up).
17  "'A plea of guilty entered by one fully aware of the direct consequences . . . must stand unless
18  induced by threats . . . , misrepresentation . . . , or perhaps by promises that are by their nature
19  improper as having no proper relationship to the prosecutor's business (e.g. bribes).'" *Id.* at 755
20  (quoting with approval *Shelton v. United States*, 242 F.2d 101, 115 (5th Cir. 1957) (Tuttle, J.,
21  dissenting)).

22      If "a defendant is represented by counsel during the plea process and enters his plea upon
23  the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was
24  within the range of competence demanded of attorneys in criminal cases.'" *Hill*, 474 U.S. at 56
25  (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). The Supreme Court has held "that the
26  two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective

assistance of counsel." *Id.* at 58. The deficient-performance prong remains the same. *Id.* at 58–59. But the prejudice-prong "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. *Id.* at 59. So "to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*

### 3.   *Ground 2(a)—IATC by not investigating codefendant Austin*

In ground 2(a), Hawkins alleges that his guilty plea was not knowingly, intelligently, or voluntarily entered because trial counsel was ineffective by failing to thoroughly investigate codefendant and cooperating witness Austin and mischaracterizing and not sharing with him the State's investigators' notes from her verbal proffer. ECF No. 22 at 14–18. Specifically, Hawkins argues that a more exhaustive investigation would have revealed that Austin told a friend that she was contemplating implicating Hawkins in the murder but never told the friend that Hawkins was the shooter. ECF No. 94 at 20.

#### a.   *Background information*

Austin was indicted in December 2010 for conspiracy to commit murder, burglary while in possession of a deadly weapon, and murder with use of a deadly weapon. ECF No. 34-2. She made a verbal proffer to the State on August 11, 2011, ECF No. 46-1 at 26–44, and was released from detention to house arrest in September 2011. ECF No. 41-13 at 14–15. Austin successfully moved to be released from house arrest and was moved to intensive supervision on January 17, 2012. ECF No. 46-1 at 25. The State did not oppose her request for that relief. ECF No. 46-1 at 25.

Two State investigators took notes of Austin's verbal proffer. ECF No. 46-1 at 26–44. The State produced one investigator's set of notes (handwritten and typed) to trial counsel on September 29, 2015, and it produced the second investigator's set of notes (handwritten and typed) on October 5, 2015. *Id.* at 26, 36. According to the investigators' notes, Austin stated that Hawkins bought a gun from Rodriguez around early November and gave that gun back to Rodriguez on the night of the murder. *Id.* at 33. Hawkins and Rodriguez left the apartment

together that evening, but Austin didn't know who had the gun when they left. ECF *Id.* at 33–34, 43.

About an hour later, Hawkins and Rodriguez burst through the door, stripped, and burned their clothing in the fire that Hawkins asked Austin to light. ECF No. 46-1 at 34, 43. The investigators' notes do not agree whether Austin stated that Hawkins put the gun on the counter. *Compare* ECF No. 46-1 at 34 ("[b]last through door – Cory put gun on counter"), *with* ECF No. 46-1 at 43 ("[g]un – puts gun on counter – C & M both looked panicked"). Hawkins and Rodriguez agreed that the gun needed to go and told Austin to clean it. *Id.* at 34, 43. Salliotte and Rodriguez left in Rodriguez's car and Hawkins and Austin later left in Salliotte's car. *Id.* at 34, 43.

A few days later, Hawkins and Salliotte told Austin the story they needed to stick to. ECF No. 46-1 at 35, 44. Austin overheard Hawkins "talking about a 'murder[,]'" *Id.* at 35, or "homicide[.]" *Id.* at 44. Hawkins "attempted to guilt" Austin. *Id.* He told her that a "'prominent figure'"—meaning a "good guy"—got "hurt" but he "didn't do it." *Id.* at 35, 44. And Hawkins begged Austin not to deviate from the planned story because the police will "pin" the murder on him as he's Black and has a criminal record. ECF *Id.* at 44.

### b. State court determination

NCA rejected this claim on direct appeal, explaining:

> Hawkins claims the district court erred by denying his presentence motion to withdraw his guilty plea. Specifically, he claimed his plea should be withdrawn because counsel informed the district court about a week before trial they would be ineffective if the trial was to proceed because they only recently became aware Hawkins' co-defendant was going to testify Hawkins was the shooter. Hawkins claimed these statements coupled with the fact counsel failed to investigate his codefendant caused him to plead guilty. Hawkins also claimed his plea should be withdrawn because counsel failed to communicate with him and provide him with his discovery.

> The district court held an evidentiary hearing on Hawkins' claims. At the evidentiary hearing, counsel testified they only did a cursory background check into the codefendant because, while they believed she would be an adverse witness to Hawkins, they did not know she was going to testify Hawkins was the shooter. Counsel testified they did not feel comfortable cross-examining the codefendant because of the lack of investigation but they also testified they did have some information, such as the codefendant's drug use and numerous conflicting statements to the police, with which to impeach her. Further, one of Hawkins' counsel talked to him about the impact of the codefendant's testimony when

discussing whether to plead guilty or not. Counsel also testified they encouraged Hawkins to plead guilty based on the composition of the jury venire. They did not believe this was a favorable jury for receiving less than the death penalty.

As to the communication issue, one of Hawkins' counsel testified she told him she did not like to give defendants copies of discovery because of the possibility other inmates might use his discovery against him. She testified Hawkins agreed not to receive his discovery for this reason. Further, counsel testified they reviewed discovery with him and, if he had questions about specific pieces of evidence, they discussed them with him. Hawkins largely agreed with this portion of the testimony from counsel but stated he did not have a cellmate and there was no danger of his discovery being used against him.

At the conclusion of the hearing, the district court made the following findings: counsel exaggerated her ineffectiveness at the motion for continuance of trial; counsel had done some investigation of the codefendant; counsel knew the codefendant was going to testify against Hawkins, they just did not know the substance of the testimony; there was ample information in the record to impeach the codefendant with, including the codefendant's conflicting statements to the police and her drug use; the codefendant did not have a criminal history; Hawkins failed to demonstrate what other evidence counsel could have found to attack the credibility of the codefendant; counsel did not like the jury venire; Hawkins was not challenging the understanding and knowing nature of the plea; and Hawkins had two days to consider the plea and had time prior to pleading to speak to his family. Based on these findings, the district court found counsel was not ineffective and there was no fair or just reason to withdraw the plea.

A defendant may move to withdraw a guilty plea before sentencing, NRS 176.165, and "a district court may grant a defendant's motion to withdraw his guilty plea before sentencing for any reason where permitting withdrawal would be fair and just," *Stevenson v. State*, 131 Nev. _, _, 354 P.3d 1277, 1281 (2015). "[T]he district court must consider the totality of the circumstances to determine whether permitting withdrawal of a guilty plea before sentencing would be fair and just." *Id.* We give deference to the findings of the district court so long as they are supported by the record. *Id.*

"A defendant who pleads guilty upon the advice of counsel may attack the validity of the guilty plea by showing that he received ineffective assistance of counsel under the Sixth Amendment to the United States Constitution." *Molina v. State*, 120 Nev. 185, 190, 87 P.3d 533, 537 (2004). Guilty pleas are presumptively valid and the "defendant has a heavy burden to show the district court that he did not enter his plea knowingly, intelligently, or voluntarily." *Id.* "To establish prejudice in the context of a challenge to a guilty plea based upon an assertion of ineffective assistance of counsel, a defendant must demonstrate a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 190–91, 87 P.3d at 537 (internal quotation marks omitted).

Based on the testimony provided at the evidentiary hearing, we conclude the district court's findings are supported by the record. Hawkins failed to demonstrate counsel were ineffective such that he did not enter his plea knowingly, intelligently, or voluntarily. He discussed his plea with counsel and counsel explained what the codefendant's testimony would mean to his trial. Counsel, while not having done a thorough investigation into the codefendant, had

several avenues of cross-examination to pursue had the case gone to trial. Further, Hawkins failed to demonstrate what evidence would have been produced had counsel done further investigation. Finally, Hawkins failed to demonstrate a reasonable probability he would not have pleaded guilty and would have insisted on going to trial. Aside from the codefendant issue, counsel also recommended Hawkins plead guilty based on counsels' assessment of the jury venire. Hawkins did not address this below or in his brief on appeal. The burden is on Hawkins to demonstrate he would not have pleaded guilty and would have insisted on going to trial. Therefore, we conclude the district court did not abuse its discretion by denying this claim.

ECF No. 44-18 at 2–5.

NCA declined to reach this claim in the writ proceeding on law-of-the-case grounds, concluding the district court did not err in denying it. ECF No. 49-6 at 2–4.

### c. Analysis

Hawkins argues that NCA's factual findings are not entitled to deference because that court failed to consider his subjective state of mind when he pled guilty and wrongly relied on the state court's finding that trial counsel exaggerated their lack of preparedness. ECF No. 94 at 21. Neither argument has merit.

First, the record does not support Hawkins's argument that NCA ignored his subjective state of mind when resolving this claim. Hawkins testified during the evidentiary hearing that he pled guilty because he thought that trial counsel was ill-prepared. ECF No. 43-22 at 94. After Hawkins made this statement, the trial court asked why, then, did his pro se plea-withdrawal motion argue that he pled guilty because he "'was led to believe that a potential witness would be testifying against him.'" Id. at 94–95. Upon further questioning by the court, Hawkins testified that he "took the deal" after trial counsel explained to him that Austin would testify that he was the shooter, and he immediately moved to withdraw his plea because he believed that trial counsel was wrong on that score. Id. at 97. The trial court surmised it appeared that Hawkins "thought he found some technicality, that [Austin's] name wasn't on that particular witness list and somehow she wasn't going to be able to testify and so he was going to be able to withdraw his plea when in fact, obviously, that was incorrect." Id. at 120. NCA expressly stated that it

considered the testimony elicited at the evidentiary hearing. ECF No. 44-18 at 5. Hawkins is correct that NCA didn't mention his testimony in its decision, but that is not determinative because "a state court need not make detailed findings addressing all the evidence before it." *Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003).

Second, to the extent Hawkins contends that NCA should not have considered the validity of trial counsels' assertion that they would not be effective at trial, he is mistaken. *See Hill*, 474 U.S. at 56 (reiterating that when a defendant "enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases" (cleaned up)); *accord Hampton*, 143 F.4th at 1073 (explaining state postconviction court "was not bound by [trial counsel's] subjective beliefs about the quality of her representation") (citing *Harrington*, 562 U.S. at 109–110)). Moreover, the record supports the NCA's finding that trial counsel exaggerated their lack of preparation regarding Austin. Trial counsel Connolly refuted Hawkins's testimony that he did not know until the evidentiary hearing that trial counsel had evidence to impeach Austin's credibility if she testified that he was the shooter. ECF No. 43-22 at 19–20. Connolly refused to testify that she wasn't prepared to cross-examine Austin; rather, Connolly argued they needed more time to investigate Austin's background beyond "what we had done" and compare her anticipated testimony to other witnesses' statements to see if it supported her version or not. *Id.* at 14, 54. But trial counsel Bunion's testimony shows that the outstanding work Connolly identified had, in fact, already been done because trial counsel's theory of defense was that Hawkins wasn't the shooter. *Id.* at 58–59; *accord id.* at 75–76.

Trial counsel knew that Austin "didn't have felonies, you know, the basic any felonies, crimes involving dishonesty." ECF No. 43-22 at 20. They also knew that Austin's experienced defense attorney believed that she was credible: "she had been on drugs, that she wasn't on drugs anymore. She got her life together and she was going to say that." *Id.* at 39. Trial counsel recalled Austin's counsel saying that she "came across as very - - she felt really bad. She felt really contrite.

She was very credible. She was pregnant again, had turned her life around, and was not doing drugs." *Id.* at 44.

And trial counsel knew that several means for attacking Austin's credibility were baked into her statements. ECF No. 43-22 at 14–15, 58–60. As the trial court accurately summarized, "[i]n terms of a witness who, number one, is admittedly giving a least basically, three different kinds of statements, the statement to the police originally and then the proffer notes and then an oral declaration of Mr. Hawkins being the shooter, there's built-in inconsistency there to attack her credibility." *Id.* at 116. "[S]econd to that, she's admitting involvement in this whole thing, whether

it's just as an accessory before or after the fact or as involved in a conspiracy; she's admitting that she was a drug addict or a drug user, including that she used that night and I believe they were - - the reference was to methamphetamine; and she's clearly seeking a benefit from the State. I mean, there was all this information built in to challenge her credibility." *Id.* at 116.

NCA's decision rejecting this claim is not based on an unreasonable determination of the facts, so I defer to its factual findings in resolving Hawkins's § 2254(d)(1) arguments. On that front, Hawkins first argues that NCA's determination is unreasonable under *Strickland* because trial counsel told him the proffer notes indicated that Austin would testify and say that he was the shooter, but the notes merely suggest that Hawkins, at worst, believed a drug deal was going down and told Austin he "didn't do it." ECF No. 94 at 17–18. I acknowledge that trial counsel Luem and prosecutor Coumou both stated during the evidentiary hearing that Austin's ("Hawkins-was-the-shooter") anticipated testimony came from the investigators' notes from her verbal proffer. But the trial court disagreed, and it was quickly resolved that Austin's attorney told trial counsel that information during a telephone call. ECF No. 43-22 at 109–112.

Importantly, that the information came from a telephone conversation with Austin's attorney, not the proffer notes, wasn't something that Hawkins learned after he pled guilty. Hawkins, in fact, attended the hearing in which trial counsel clearly, unequivocally, and

1  repeatedly stated that Austin's ("Hawkins-was-the-shooter") statement was provided in a
2  telephone conversation that trial counsel had with Austin's attorney, not the proffer notes. ECF
3  No. 42-29 at 11–13, 26.

4          Hawkins next argues that had trial counsel thoroughly investigated Austin, they would
5  have discovered that she sent a series of letters to Jason Thorpe around the time of her arrest, and
6  Thorpe could testify that Hawkins never admitted to Thorpe that he murdered Nathan and
7  Austin never told Thorpe that Hawkins was the shooter. ECF No. 94 at 20. To support this
8  argument, Hawkins relies on a letter dated January 28, 2019, sent from his state postconviction
9  investigator to his state postconviction counsel and recounting the investigator's interview of
10 Thorpe. ECF No. 47-1 at 220–222. Hawkins first presented the letter during his state
11 postconviction writ proceedings. I cannot consider the letter in this context because it was not
12 part of the record that was before the NCA when it rejected this claim on direct appeal, and NCA
13 declined to consider this claim during the postconviction proceeding on law-of-the-case grounds.
14 *See Cullen*, 563 U.S. at 181 (holding that "review under § 2254(d)(1) is limited to the record that
15 was before the state court that adjudicated the claim on the merits").

16         The record supports the NCA's reasonable conclusions that trial counsel adequately and
17 accurately communicated to Hawkins before he pled guilty that (1) Austin could appear as a
18 witness for the State in his trial, (2) Austin was expected to testify that Hawkins was the shooter,
19 and (3) trial counsel had several means to impeach Austin if she testified that Hawkins was the
20 shooter. The record also supports the NCA's reasonable conclusion that trial counsel's limited
21 investigation of Austin was not objectively unreasonable under the circumstances. *See Strickland*,
22 466 U.S. at 690–91 ("strategic choices made after thorough investigation of law and facts relevant
23 to plausible options are virtually unchallengeable; and strategic choices made after less than
24 complete investigation are reasonable precisely to the extent that reasonable professional
25 judgments support the limitations on investigation").

26

The NCA's decision rejecting Hawkins's claim that his plea is invalid because trial counsel failed to investigate codefendant Austin and mischaracterized and withheld notes from her verbal proffer is not contrary to, or an unreasonable application, of clearly established federal law. Nor is the NCA's decision rejecting this claim based on an unreasonable determination of the facts in light of the evidence. Accordingly, Hawkins is not entitled to habeas relief on ground 2(a).

### 4. *Ground 2(b)—IATC by advising to plead guilty*

In ground 2(b), Hawkins alleges that his guilty plea was not knowingly, intelligently, or voluntarily entered because trial counsel was ineffective by advising him to plead guilty without providing him discovery or explaining that he had a strong mitigation case for avoiding the death penalty. ECF No. 22 at 18–19.

#### a. *State court determination*

NCA rejected this claim on direct appeal, explaining:

> Hawkins also claimed his plea should be withdrawn because counsel failed to communicate with him and provide him with his discovery. Specifically, he claimed counsel failed to inform him he had a strong mitigation case for sentencing and failed to review information relating to the trial and penalty phases of his case. Hawkins asserts had he known this information, he would not have agreed to plead guilty to all of the charges in exchange for removal of the death penalty as a sentencing option. Testimony given at the hearing established both counsel and the investigator met with Hawkins often, both counsel and the investigator went through the discovery with Hawkins, and Hawkins never requested copies of his discovery. Hawkins failed to demonstrate how the failure to provide him with his discovery, or how information contained in the discovery, would have altered his decision to plead guilty. Therefore, the district court did not abuse its discretion by denying this claim.

ECF No. 44-18 at 5–6. NCA declined to reach this claim in the writ proceeding on law-of-the-case grounds, concluding the district court did not err in denying it. ECF No. 49-6 at 2–4.

#### b. *Analysis*

Hawkins argues that NCA's factual findings are not entitled to deference because it failed to consider that he (1) immediately moved to withdraw his plea based on allegations that his attorneys failed to communicate with him and (2) testified that he would have been better informed with the allegedly withheld information. ECF No. 94 at 24. I disagree for two reasons.

First, the timing of Hawkins's plea-withdrawal motion and the basis of his concurrently filed motion to terminate trial counsel are matters that informed the trial court's decision to appoint him new trial counsel and task that attorney with filing a counseled plea-withdrawal motion, if necessary. *See* ECF No. 43-9 at 3–4. NCA's failure to mention this sequence of events is not determinative. *Miller-El*, 537 U.S. at 347. Second, NCA recounted part of Hawkins's testimony in rejecting this claim. ECF No. 44-18 at 3.

I therefore defer to NCA's factual findings in assessing this claim. Having done so, I find that NCA reasonably concluded that Hawkins failed to satisfy either *Strickland* prong. In addition to the evidence identified by the state courts, the record reflects that Hawkins provided only broad and generalized testimony about attorney neglect while the defense team gave detailed testimony showing that they frequently discussed matters and reviewed materials with him, and confirmed the danger of jailhouse snitches with him but would let him review and retain whatever he wanted. *Compare* ECF No. 43-22 at 80–81, *with id.* at 21, 27–28 (Connolly testifying "there was constant communication with [Hawkins], with me, with Mr. Bunin, with Craig, our mitigation expert, and [Hawkins] could call any time he wanted"), *id.* at 23–25 (Connolly testifying about general policy against having discovery in custody but how client could obtain it if they wanted it; Hawkins agreed not to receive discovery; Hawkins "absolutely" would have had access to any document he wanted if asked), *id.* at 71 (investigator Retke testifying he reviewed discovery with Hawkins "on a couple of issues that he asked about" and "photographs"), *id.* at 86 (Hawkins testifying that he did not disagree with jail phone and visiting records showing constant contact), *and id.* at 92–93 (Hawkins testifying he doesn't dispute Connolly's policy and agreed, "[w]ell, yeah, that's a good policy to follow, yes").

The NCA's decision rejecting Hawkins's claim that his plea is invalid because trial counsel withheld discovery and information about his strong mitigation case in advising him to plead guilty is not contrary to, or an unreasonable application, of clearly established federal law.

Nor is it based on an unreasonable determination of the facts in light of the evidence. So Hawkins is not entitled to habeas relief for ground 2(b).

### 5. *Ground 2(c)—IATC by coercing to plead guilty*

In ground 2(c), Hawkins alleges that his guilty plea was not knowingly, intelligently, or voluntarily entered because trial counsel was ineffective by coercing him to plead guilty. ECF No. 22 at 20–21.

NCA rejected this claim on direct appeal and declined to reach it in the writ proceeding on law-of-the-case grounds. ECF Nos. 44-18 at 2–5; 49-6 at 2–4. Hawkins argues the NCA's conclusion that he raised coercion on direct appeal is unreasonable under § 2254(d)(2), thus entitling him to de novo review of this claim. ECF No. 94 at 27. I acknowledge the NCA's decision does not use terms like coerce, force, or pressure. But I disagree that it did not resolve this claim. The record is awash with documents in which Hawkins consistently argued that his plea was involuntary, asserting he felt coerced by trial counsels' inadequate investigation of Austin coupled with their statements that he'd likely be convicted and sentenced to death. *See, e.g.*, ECF Nos. 43-15 at 19–20 (Hawkins's counseled plea-withdrawal motion); 43-16 at 4–5 (State's response); 43-22 at 102–103 (trial counsel Luem's oral argument during evidentiary hearing on plea-withdrawal motion); 43-22 at 117–20 (trial court's findings denying motion); 44-13 at 26–27 (Hawkins's opening brief on direct appeal explaining how he was "forced" to plead guilty); 44-16 at 17 (Hawkins's reply brief on direct appeal describing situation as a "Hobson's choice"). So I defer to the NCA's factual findings.

Hawkins next argues that the NCA's decision is unreasonable under *Strickland* because trial counsels' statement they would not be effective at trial combined with statements they didn't like the jury venire overrode the intelligent and voluntary nature of his guilty plea. ECF No. 94 at 24–27. I disagree. Starting with trial counsels' advice about Austin, as I explained above, the record supports reasonable conclusions that trial counsels' investigation of Austin was not objectively unreasonable; they were prepared for trial and armed with evidence to impeach

Austin's anticipated testimony, and they adequately communicated with Hawkins about these matters before he pled guilty. As for trial counsels' advice regarding the jury, Connolly testified during the evidentiary hearing that the jury venire was "probably one of the worst juries [she's] ever seen" in terms of the number of jurors who were inclined to impose the death penalty and that venire is one reason why trial counsel advised Hawkins to plead guilty. ECF No. 43-22 at 40–41. There is no evidence that trial counsel grossly mischaracterized the jury venire. Thus, the record supports the reasonable conclusion that trial counsel performed adequately when they advised Hawkins about Austin's anticipated trial testimony and the jury venire before he pled guilty. *See Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986) (explaining that "a mere inaccurate prediction, standing alone, would not constitute ineffective assistance but "the gross mischaracterization of the likely outcome … combined with the erroneous advice on the possible effects of going to trial, falls below the level of competence required of defense attorneys").

The NCA's decision rejecting Hawkins's claim that his plea is not knowing, intelligent, or voluntary because trial counsel coerced him to plead guilty is not contrary to, or an unreasonable application, of clearly established federal law, nor is it based on an unreasonable determination of the facts in light of the evidence. So Hawkins is not entitled to habeas relief on ground 2(c).

### 6. *Ground 2(d)*—Brady/Giglio *claim*

In ground 2(d), Hawkins argues that his guilty plea was not knowing, voluntary, and intelligent because the State withheld exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). ECF No. 22 at 21–25. Specifically, Hawkins argues the State belatedly disclosed the benefit that Austin received for her verbal proffer (i.e., the State did not oppose her requests to be released to house arrest and, later, intensive supervision); belatedly disclosed the State's investigators' notes from Austin's verbal proffer; and failed to disclose the benefit that Austin received for her anticipated trial testimony (i.e., sentence of probation). ECF No. 94 at 30–31.

a.  *Legal standards*—Brady/Giglio *and* Ruiz

Long-established Supreme Court precedent holds that the right to a fair trial requires the government to turn over exculpatory or impeachment evidence to the defense that is material to either guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154; *United States v. Bagley*, 473 U.S. 667, 678 (1985). To succeed on a *Brady/Giglio* claim, the petitioner must establish three elements: "(1) the evidence is favorable to the accused, (2) the prosecution suppressed the evidence, and (3) the evidence is 'material.'" *Hooper v. Shinn*, 985 F.3d 594, 616 (9th Cir. 2021) (quoting *Brady*, 373 U.S. at 87). Long-established Supreme Court precedent also holds "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *United States v. Ruiz*, 536 U.S. 622, 633 (2002).

b.  *State court determinations*

In affirming the denial of Hawkins's postconviction petition, NCA did not expressly address his *Brady/Giglio* argument. Rather, it denied the IATC claims in which this argument was embedded on-the-law-of-the-case grounds, explaining:

> First, Hawkins claimed his counsel was ineffective for failing to investigate a codefendant to ascertain her potential testimony so as to advise Hawkins regarding entry of a guilty plea. Hawkins also contended he was coerced into pleading guilty due to counsel's deficient investigation into his codefendant's potential testimony. In addition, Hawkins claimed his counsel was ineffective for failing to provide him with discovery prior to entry of his plea.
>
> Hawkins raised these issues in a presentence motion to withdraw his guilty plea, the trial-level court conducted an evidentiary hearing concerning these issues, and denied the motion. Hawkins challenged the trial-level court's decision to deny these claims on direct appeal and this court affirmed the decision of the district court because Hawkins failed to demonstrate his counsel was ineffective. *Hawkins v. State*, Docket No. 71590-COA (Order of Affirmance, December 28, 2017). Because these claims have already been considered and rejected by this court, the doctrine of the law of the case prevents further consideration of these claims. *See Hall v. State*, 91 Nev. 314, 315-16, 535 P.2d 797, 798-99 (1975). Therefore, we conclude the district court did not err by denying these claims.

ECF No. 49-6 at 3.

In affirming Hawkins's judgment of conviction on direct appeal, NCA determined that he "failed to demonstrate [trial] counsel were ineffective such that he did not enter his plea knowingly, intelligently, or voluntarily[,]" explaining:

> Based on the testimony provided at the evidentiary hearing, we conclude the district court's findings are supported by the record. Hawkins failed to demonstrate counsel were ineffective such that he did not enter his plea knowingly, intelligently, or voluntarily. He discussed his plea with counsel and counsel explained what the codefendant's testimony would mean to his trial. Counsel, while not having done a thorough investigation into the codefendant, had several avenues of cross-examination to pursue had the case gone to trial. Further, Hawkins failed to demonstrate what evidence would have been produced had counsel done further investigation. Finally, Hawkins failed to demonstrate a reasonable probability he would not have pleaded guilty and would have insisted on going to trial. Aside from the codefendant issue, counsel also recommended Hawkins plead guilty based on counsels' assessment of the jury venire. Hawkins did not address this below or in his brief on appeal. The burden is on Hawkins to demonstrate he would not have pleaded guilty and would have insisted on going to trial. Therefore, we conclude the district court did not abuse its discretion by denying this claim.

ECF No. 44-18 at 5.

And in affirming the denial of Hawkins's postconviction writ petition, NCA determined that Hawkins failed to satisfy either *Strickland* prong for the appellate-counsel-ineffectiveness claim under which the *Brady/Giglio* argument was also raised, explaining;

> Next, Hawkins argues that the district court erred by denying his claims of ineffective assistance of appellate counsel. To prove ineffective assistance of appellate counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that the omitted issue would have a reasonable probability of success on appeal. *Kirksey v. State.* 112 Nev. 980,998, 923 P.2d 1102, 1113-14 (1996). Appellate counsel is not required to raise every non-frivolous issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Rather, appellate counsel will be most effective when every conceivable issue is not raised on appeal. *Ford v. State*, 105 Nev. 850, 853, 784 P .2d 951, 953 (1989). Both components of the inquiry must be shown. *Strickland*, 466 U.S. at 697. We give deference to the court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader* 121 Nev. At 686, 120 P.3d at 1166.
>
> Hawkins claimed his appellate counsel was ineffective for failing to investigate the codefendant and properly argue on direct appeal that his guilty plea was involuntary and coerced because he lacked access to information concerning his codefendant's out-of-court statements and potential testimony. As explained previously, Hawkins asserted on direct appeal that his counsel's failure to investigate the potential testimony of the codefendant caused his guilty plea to be invalid. *Hawkins v. State*, Docket No. 71590-COA (Order of Affirmance, December 28,

2017). As counsel raised the underlying issue on direct appeal, Hawkins failed to demonstrate his counsel's performance fell below an objective standard of reasonableness. To the extent Hawkins asserted counsel should have raised these claims in a different manner, Hawkins failed to demonstrate a reasonable likelihood of success had counsel presented the underlying issues differently. Therefore, we conclude the district court did not err by denying these claims.

ECF No. 49-6 at 3–6.

### c.  Analysis

Hawkins identifies three categories of *Brady/Giglio* material: (1) the benefit exchanged for Austin's verbal proffer, (2) the State's investigator's notes from that proffer, and (3) the benefit exchanged for Austin's anticipated trial testimony. I begin with *Brady*'s favorability prong. It is well established that evidence affecting the credibility of a witness whose reliability "may well be determinative of guilt or innocence" is favorable exculpatory evidence. *Giglio*, 405 U.S. at 154. Evidence that Austin received no opposition from the State regarding her pretrial custody requests in exchange for her verbal proffer fits this bill. *See Hovey v. Ayers*, 458 F.3d 892, 918 (9th Cir. 2006) (holding evidence that jailhouse informant received a release from custody on his own recognizance, despite a probation violation, between his plea and testifying in the defendant's trial was favorable because it "could have given the jury an additional reason to distrust [the informant's] testimony"). So, too, do the proffer notes because they show that Austin's story changed from claiming that Hawkins was with her the entire night of the murder to asserting that he owned a gun and left the apartment with Rodriguez and his gun for at least an hour that night. *Cf. Cal. v. Green*, 399 U.S. 149, 153–164 (1970) (explaining the jury's role in considering credibility of a witness whose story has changed). The proffer notes also contain favorable exculpatory evidence: Hawkins's statement to Austin that he didn't commit the murder.

Evidence that the State promised Austin leniency in exchange for her anticipated trial testimony, or even an implicit agreement to that effect, is also favorable impeachment evidence. *See Hovey*, 458 F.3d at 919. But there is a hitch with that evidence: the record here supports the reasonable conclusion that the State made no such promise or agreement. The State repeatedly

stated that Austin had not been offered any deal in exchange for her testimony. The State argued in motion practice that "Austin was not, and has not been, offered a deal or any type of negotiation in exchange for her release or her testimony." ECF No. 42-27 at 4. And it did not waiver from this position during oral argument on Hawkins's motion to continue trial; rather, it provided a detailed response denying trial counsels' accusations that it had negotiated with Austin for her anticipated trial testimony. ECF No. 46-1 at 62–63 ("To date, neither Mr. Coumou nor I have ever laid eyes on Jessica Austin. We have been in communication with her attorney in order to try to set something up. We didn't know if Mr. Hawkins was going to take the offer that was extended to him. Mr. Langford is in a trial. We haven't met with her yet."). Hawkins points to a letter that Austin purportedly sent him when they were both in pretrial detention about a possible plea deal, but I do not consider that letter because it was not part of the record before the NCA when it decided this claim. *See Cullen*, 563 U.S. at 181.

So, I move onto suppression as to only two items of evidence: (1) the benefit exchanged for Austin's verbal proffer and (2) the investigators' notes from that proffer. To the extent this evidence constitutes or contains exculpatory impeachment evidence, NCA reasonably rejected Hawkins's *Brady/Giglio* claim because clearly established Supreme Court precedent holds that the government is not constitutionally obligated to disclose material impeachment evidence before entering a plea agreement with a criminal defendant. *Ruiz*, 536 U.S. at 633.[7] To the extent the

---

[7] Ninth Circuit precedent holds that the Constitution requires the government to disclose material exculpatory or impeachment evidence before entry of a defendant's guilty plea. *See, e.g., Sanchez v. United States*, 50 F.3d 1448, 1454 (9th Cir. 1995); *Smith v. Baldwin*, 510 F.3d 1127, 1148 (9th Cir. 2007) (en banc) (post-*Ruiz* case applying standard announced in *Sanchez*). "Although the usual standard of materiality is whether the failure to disclose the evidence undermines confidence in the outcome of the trial, the issue in a case involving a guilty plea is whether there is a reasonable probability that but for the failure to disclose the *Brady* material, the defendant would have refused to plead and would have gone to trial. *Sanchez*, 50 F.3d at 1454. At least one Ninth Circuit judge has recognized that circuit's holding extending *Brady/Giglio* to plea bargaining conflicts with *Ruiz. See Parker v. Cnty. of Riverside*, 78 F.4th 1109, 1117–18 (9th Cir. 2023) (R. Nelson, J., concurring) (collecting cases and explaining that "all but two of our sister circuits have appropriately limited *Brady* to trial"); *United States v. Harshman*, 2021 WL 3929926, at *3 (9th Cir. Sept. 2, 2021) (unpublished) (R. Nelson, J., concurring) ("[an extension of *Brady/Giglio* to material impeachment information in the guilty plea context would seem inconsistent with *Ruiz*"). I do not resolve any tension between *Ruiz* and *Sanchez* here because, applying AEDPA deference and the Ninth Circuit's precedent, I would still conclude that NCA reasonably rejected this claim for the reasons explained above.

proffer notes contain pure exculpatory evidence, the record reflects that the State disclosed the notes (and the benefit exchanged) in the days and weeks before it accepted Hawkins's guilty plea. Hawkins's guilty plea was entered on October 15, 2015, which is 17 days after the first set of proffer notes were disclosed, three days after the State confirmed in motion practice the benefit Austin received for the proffer, and two days after the hearing denying Hawkins's motion to preclude Austin's trial testimony or continue trial. *See, e.g.*, ECF No. 42-27 at 4 (State's October 12, 2015, response); ECF No. 41-13 at 8 (Hawkins's motion confirming first set of proffer notes disclosed on September 28, 2015, and sealed order authorizing Austin's release from house arrest was disclosed on October 1, 2015); ECF No. 42-29 at 31–32 (transcript of October 13, 2015, hearing in which state court denied Hawkins's motion to preclude Austin's trial testimony or to continue trial and confirmed if Austin testified at trial, then Hawkins would be permitted to question her or the State's investigator about benefit she received in exchange for her proffer).

Hawkins provides no Supreme Court authority holding that belated disclosure of *Brady/Giglio* material in the guilty-plea context can constitute suppression. ECF Nos. 22 at 21, 94 at 28. He instead relies on the Second Circuit's decision in *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001), but that case is materially distinguishable because it concerns belated disclosure incident to trial, not plea negotiations. It is further distinguishable based on the nature of the information withheld and timing of the disclosure.

In *Leka*, the State of New York waited until three business days before trial to disclose the name of the off-duty police officer who witnessed the murder, it failed to disclose that the eyewitness's statement undermined testimony of both eyewitnesses who were being sponsored by the state, and it obtained a protective order preventing the defense from interviewing that witness until the date the defense mounted its case. 257 F.3d at 99–100. The Second Circuit held this was suppression under *Brady* because the belated disclosure afforded the defense an insufficient opportunity to use the exculpatory information. *Id.* at 102–103. *Leka* is not comparable because the record here shows that Hawkins knew far more information about Austin, the chance

that she might cooperate and change her story, and her potential testimony in that regard well before trial. Austin was a codefendant, not a witness known only to the prosecution until the eve of trial. The defense generally investigated Austin's background and knew early that she had been released from custody. *See, e.g.*, ECF No. 36-1 at 4 (June 2014 hearing stating Austin was "out of custody"); ECF No. 43-22 at 55 (Bunin testified trial counsel knew "sometime well before trial" that Austin had been released because she showed to court out of custody); *Id.* at 86–87 (Hawkins testified that he knew Austin had been released based on court appearances and confirmed his attorneys said she'd been talking to law enforcement); *Id.* at 17–18 (Connolly testified she "always felt that [Austin] was going to cooperate" and discussed that with Hawkins); *Id.* at 68, 75 (defense investigator Retke testified Connolly mentioned shortly after his services were approved "that Jessica Austin was charged with Mr. Hawkins and she may become some type of a snitch or something like that," and every subsequent defense discussion that Retke was part of included the problem that Austin "could possibly be a snitch"). So the record supports the reasonable conclusion that the State did not suppress notes from, or the benefit exchanged for, Austin's verbal proffer.

This claim also stumbles at materiality. Evidence is material for *Brady/Giglio* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995) (cleaned up). As explained above, the record supports the reasonable conclusions that trial counsel's investigation of Austin was not objectively unreasonable; they were prepared for trial, including having evidence to impeach Austin's anticipated testimony, and trial counsel adequately communicated with Hawkins about these matters. Hawkins is mistaken that in viewing the proffer notes, it would have shown him that trial counsel mischaracterized them because the record reflects that Austin's "Hawkins-was-the-shooter" anticipated testimony was verbally conveyed to trial counsel by her attorney, not the proffer notes as Hawkins's believes. Hawkins argues that earlier disclosure would have led trial counsel to discover Thorpe. But what value

Thorpe could have added to Hawkins's defense is still unclear based on this record. *See infra* ground 6. The record supports the reasonable conclusion that trial counsel performed reasonably when they informed Hawkins about the unfavorable jury venire, which is a valid concern that Hawkins does not address here. And Hawkins also ignores that Salliotte consistently stated that he and Rodriguez left together the night of the murder, were gone for about an hour, and both men quickly burned all their clothing upon returning to the apartment. NCA reasonably concluded that Hawkins failed to show a reasonable probability that he would have gone to trial but for the belated disclosure of the proffer notes and benefit Austin received for the proffer.

The NCA's decision rejecting Hawkins's claim that his plea is invalid because the State withheld *Brady/Giglio* material is not contrary to, or an unreasonable application, of clearly established federal law, nor is it based on an unreasonable determination of the facts in light of the evidence. Accordingly, Hawkins is not entitled to habeas relief for ground 2(d).

**C. Ground 3—IATC by not investigating codefendant Austin**

In ground 3, Hawkins alleges that his trial counsel was ineffective by failing to investigate codefendant Austin and mischaracterizing and not sharing with him the State's investigators' notes from her verbal proffer. ECF No. 22 at 25–29. To prevail on this claim, Hawkins must meet *Strickland*'s two-pronged test. As explained above, in affirming the denial of Hawkins's state postconviction writ petition, NCA declined to reach this claim on law-of-the-case grounds and concluded the state court did not err in denying relief on this claim. ECF No. 49-6 at 2–3. And NCA rejected this claim on direct appeal, concluding that the state court's evidentiary findings were supported by the record and Hawkins failed to satisfy either *Strickland* prong. ECF No. 44-18.

This claim is legally and factually intertwined with the claim raised in ground 2(a). For the reasons explained above in ground 2(a), the NCA's decision rejecting Hawkins's claim that trial counsel failed to investigate codefendant Austin and mischaracterized and withheld notes from her verbal proffer is not contrary to, or an unreasonable application, of clearly established

1  federal law. Nor is it based on an unreasonable determination of the facts in light of the evidence.

2  Thus, Hawkins is not entitled to habeas relief for ground 3.

3  **D.  Ground 4—IATC by advising to plead guilty**

4  In ground 4, Hawkins alleges that his trial counsel was ineffective by advising him to

5  plead guilty despite not providing him discovery or informing him about his strong mitigation

6  case. ECF No. 22 at 29–32. To prevail on this claim, Hawkins must meet *Strickland*'s two-pronged

7  test. As explained above, in affirming the denial of Hawkins's state postconviction writ petition,

8  NCA declined to reach this claim on law-of-the-case grounds and concluded the state court did

9  not err in denying relief on this claim. ECF No. 49-6 at 2–3. And NCA rejected this claim on direct

10 appeal, concluding that the state court's evidentiary findings were supported by the record and

11 Hawkins had failed to satisfy either *Strickland* prong. ECF No. 44-18 at 5–6.

12 This claim is legally and factually intertwined with the claim raised in ground 2(b). For

13 the reasons explained above in ground 2(b), the NCA's decision rejecting Hawkins's claim that

14 trial counsel was ineffective by advising him to plead guilty despite not providing him discovery

15 or informing him about his strong mitigation case is not contrary to, or an unreasonable

16 application, of clearly established federal law. Nor is it based on an unreasonable determination of

17 the facts in light of the evidence. Thus, Hawkins is not entitled to habeas relief for ground 4.

18 **E.  Ground 5—IATC by coercing to plead guilty**

19 In ground 5, Hawkins alleges that his trial counsel was ineffective by coercing him to

20 plead guilty. ECF No. 22 at 32–33. To prevail on this claim, Hawkins must meet *Strickland*'s two-

21 pronged test. As explained above, in affirming the denial of Hawkins's state postconviction writ

22 petition, NCA declined to reach this claim on law-of-the-case grounds and concluded the state

23 court did not err in denying relief on this claim. ECF No. 49-6 at 2–3. And NCA rejected this claim

24 on direct appeal, concluding that the state court's evidentiary findings were supported by the

25 record and Hawkins had failed to satisfy either *Strickland* prong. ECF No. 44-18 at 5–6.

26

This claim is legally and factually intertwined with the claim raised in ground 2(c). For the reasons explained above in ground 2(c), the NCA's decision rejecting Hawkins's claim that trial counsel failed to provide him discovery or information about his strong mitigation defense is not contrary to, or an unreasonable application, of clearly established federal law. Nor is it based on an unreasonable determination of the facts in light of the evidence. Thus, Hawkins is not entitled to habeas relief for ground 5.

### F.   Ground 6—Appellate counsel ineffectiveness

In ground 6(a), Hawkins alleges that appellate counsel Luem ineffectively raised the Austin-based IATC claim by failing to investigate Austin herself and misunderstanding and not sharing notes from Austin's verbal proffer with him. ECF No. 22 at 34. In ground 6(b), Hawkins alleges that appellate counsel Luem was ineffective for failing to raise a coercion-based IATC claim. *Id.* at 35.

NCA rejected these ineffective-assistance-of-appellate-counsel (IAAC) claims during the writ proceeding, explaining:

> Hawkins claimed his appellate counsel was ineffective for failing to investigate the codefendant and properly argue on direct appeal that his guilty plea was involuntary and coerced because he lacked access to information concerning his codefendant's out-of-court statements and potential testimony. As explained previously, Hawkins asserted on direct appeal that his counsel's failure to investigate the potential testimony of the codefendant caused his guilty plea to be invalid. *Hawkins v. State*, Docket No. 71590-COA (Order of Affirmance, December 28, 2017). As counsel raised the underlying issue on direct appeal, Hawkins failed to demonstrate his counsel's performance fell below an objective standard of reasonableness. To the extent Hawkins asserted counsel should have raised these claims in a different manner, Hawkins failed to demonstrate a reasonable likelihood of success had counsel presented the underlying issues differently. Therefore, we conclude the district court did not err by denying these claims.

ECF No. 49-6 at 5–6.

The *Strickland* standard applies when analyzing a claim of appellate counsel ineffectiveness. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Under this standard, the petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a

1   merits brief raising them" and "but for his [appellate] counsel's unreasonable failure to file a

2   merits brief, [petitioner] would have prevailed on his appeal." *Id.*

3       These claims are legally and factually intertwined with the claims raised in grounds 2(a),

4   2(c), 3, and 5. But there is one difference. I could not consider the Thorpe letter in the context of

5   resolving those IATC claims, but I may consider it this context because it was part of the state

6   record that existed when NCA rejected these IAAC claims during the writ proceeding.

7       According to the letter, Thorpe told the investigator that he dated "Austin for a few

8   months after Mr. Hawkins was convicted" and was "closer to [Austin] than he was to Mr.

9   Hawkins." ECF No. 47-1 at 221. Thorpe said that he was best friends with Austin's son's father

10  Justin Gross. *Id.* Gross wanted Austin out of jail to care for their son, so Thorpe believed that

11  getting out of jail was the only thing on Austin's mind. *Id.* at 221. Thorpe said that Jessica "told

12  him if [Hawkins] did not admit to the murder of [Nathan], that she would 'drop it on him.'" *Id.*

13  And she'd given Hawkins "an ultimatum to that effect." *Id.* at 221.

14      Thorpe also said that he received three letters from Austin between the end of 2011 and

15  beginning of 2012. ECF No. 47-1 at 222. In the first letter, Austin said that she "was thinking of

16  implicating" Hawkins in the murder. *Id.* at 222. In the second letter, Austin said she "thought she

17  was going to implicate" Hawkins. *Id.* at 222. And in the third letter, Austin said, "it's done," and

18  that Thorpe "would be hearing from her very soon." *Id.* at 222. Thorpe did not have the letters

19  when he spoke to the investigator. *Id.* at 222.

20      Thorpe could possibly impeach Austin's testimony if she was not forthcoming about

21  having discussed her defense plan with anyone other than counsel. But Thorpe did not tell the

22  investigator that Austin would be lying if she implicated Hawkins in the murder or that she lied

23  when she later said that the gun belonged to Hawkins and Hawkins left the apartment with

24  Rodriguez that night or, even later, when she said that Hawkins was the shooter. And the record

25  reflects that neither trial counsel nor appellate counsel could have located Thorpe absent

26  Hawkins directing them to him. Austin was not speaking to defense counsel, she stopped

communicating with Hawkins after being released from custody, and Gross—Thorpe's best friend and the father of Austin's son and only identified link between Austin and Thorpe—died by an overdose shortly before Austin was released to house arrest. *Compare* ECF No. 47-1 at 221, *with* ECF No. 45-1 at 9–10. At bottom, the Thorpe letter doesn't undermine the NCA's reasonable conclusions that counsel was not deficient for failing to further investigate Austin and Hawkins was not prejudiced by counsel's failure to do so. *See Smith*, 528 U.S. at 288 (reiterating that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal"); *see also Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (reiterating "that appellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal").

Applying AEDPA deference and for the reasons explained above including in grounds 2(a), 2(c), 3, and 5, the NCA's decisions rejecting Hawkins's claims that appellate counsel ineffectively raised the Austin-based and coercion-based IATC claims are not contrary to, or an unreasonable application, of clearly established federal law. Nor are the NCA's decisions rejecting these claims based on an unreasonable determination of the facts in light of the evidence. Accordingly, Hawkins is not entitled to habeas relief for grounds 6(a) or 6(b).

## IV.    Certificate of appealability

This is a final order adverse to the petitioner. Rule 11 of the Rules Governing Section 2254 Cases requires me to issue or deny a Certificate of Appealability (COA). I have evaluated the claims within the petition for suitability for the issuance of a COA. Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner has made "a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the

1  petition states a valid claim of the denial of a constitutional right and (2) whether this Court's

2  procedural ruling was correct. *Id.*

3      Applying these standards, I find that a COA is warranted for ground 1. Reasonable jurists

4  could debate whether Hawkins has demonstrated a reasonable probability of a lesser sentence

5  but for trial counsel's failure to present available mitigation evidence about his troubled-

6  childhood, difficult family history, and drug use at sentencing. The state sentencing court and

7  postconviction court were one in the same, and it determined that the omitted evidence would

8  not have changed its sentencing decision. But reasonable jurists could debate whether evidence

9  explaining Hawkins's recidivism and troubled past could have undermined the state court's belief

10  that he was as culpable as Michelle and Rodriguez, but I find that a certificate of appealability is

11  not warranted for the remaining grounds.

12  **V.    Conclusion**

13      IT IS HEREBY ORDERED that the Second Amended § 2254 petition **[ECF No. 22] is**

14  **denied**.

15      IT IS FURTHERED ORDERED that a certificate of appealability is granted for ground 1

16  and denied for the remaining grounds.

17      I kindly direct the Clerk of Court to substitute Jeremy Bean for respondent Calvin

18  Johnson, enter judgment accordingly, and close this case.

19      Dated: December 10, 2025

20

21                          _____
                        Cristina D. Silva

22                          United States District Judge

23

24

25

26